Our second case for argument today is Direct Supply against the United States. Good morning, Your Honors, and may it please the Court. My name is Barry White and I represent the appellant, Direct Supply. The issue presented in this case is whether Direct Supply is entitled to a tax deduction under a now-repealed section of the tax code, Section 199. Section 199 was designed to encourage the domestic manufacturer of certain types of goods, and software is specifically identified as one of those types of property that can qualify for the deduction. Direct Supply manufactures a software product known as DSSI. DSSI is e-procurement software, which is a type of software that automates and integrates an organization's purchase of products while making only certain products visible and orderable by employees in the field, automatically, electronically transmitting purchase orders and invoices, implementing various controls, and capturing data that the organization can then use to analyze and help control its spend. I want to talk about three things here today. First, I want to talk about why the District Court erred in denying Direct Supply's motion for summary judgment under the plain language of the statute. Second, I want to talk about why the District Court erred in denying Direct Supply's motion for summary judgment under the so-called third-party comparable exception contained in the regulations. And third, I want to talk about why the United States wasn't entitled to summary judgment even if Direct Supply was not. So first, let me turn to the statute. Section 199 provides a deduction for a portion of gross receipts derived from a lease, rental, license, sale, exchange, or other disposition of software. So the questions under the statute are whether Direct Supply licenses or rents DSSI under its contracts with nursing homes and suppliers, and if so, whether Direct Supply derives revenue from those licenses or rentals. How do you get around the language in the contracts that the transaction fee here is in consideration of the provision of transaction services? And 95% of the fees here at issue are derived from the transaction fees. I think the answer to that question, as I cited these cases in my reply brief, is that the court needs to analyze the substance of the transaction. Well, that's a piece of it. The contract itself says these fees are for transaction services. It doesn't say it's for the license of the software or the use of the software. It talks about services, which would not be covered under Section 199. Well, I think what you need to do is apply a textual application of the statute. I do agree that the United States has taken sort of this shorthand characterization and said, if you're providing services, it can't qualify for the 199. It's not if you're providing services. It's if you are charging for the services. You could provide services, but if the fee is for the service, then the fee is the revenue here. Then the revenue would not be derived from the use, the license, the sale, or disposition of the software. It's coming from the service. I think, again, that we know parties can't contract around the tax law. And so we have to look at the structure of the contract. And I do agree that the contract does say that. It says what it says. But the structure of the contract is such that the revenue, I do think, is derived from this permission to use DSSI, which I believe is a license. And the reason I think it's derived from, which means it flows from, is the structure of the contract in return for being granted permission to use DSSI. The contract requires nursing homes to use it for all of their procurement needs. And it's that use that then generates the fees. And so the fees are derived. They come from. It's the purchase of the products sold from the supplier that generates the fees. And the evidence is even undisputed that the fee amount is directly related to that value of the product. And how do you get around that? The fee then is for the product, the service connected to the product, not for the software. When the software is what customers are paying for, well, is what customers seek out. And they are required to use it for 100% of their procurement needs. It's that requirement of use that then results in all of the fees. Can there be a flat fee then? Why is the fee connected to the value of the product? I think that's just a pricing model that direct supply chose to pick, presumably because it makes it easier to market or it maximizes dollars. But I think, and this is the important point, Judge, I think that if the contract had said, customer will pay X dollars per year or per month for a license of the product, I think you'd still have to do the same analysis. I think you'd still have to apply the text of the statute, because I don't think that the party's terms of their contract are necessarily dispositive of a tax issue. And that's why I think you have to... Well, sure they are. Those are the facts. The statute may tell you whether or not they have to pay the revenue, but you have to look at the facts to determine if they fall within the statute. We can't, in a contract, say that we can't contract around the tax code. We can't say that this payment is for a license. If the court then takes a look at the contract and says, I don't agree, that isn't correct. You're not going to give us the tax deduction simply because we set it in a contract. No, no, no. But you certainly have control of your own pricing models. And you told us as much in your brief. And I'm trying to understand why footnote 10, which starts on page 32 and goes to 33, doesn't actually just throw your own case for you. You say, presumably, if direct supply had chosen a different pricing model, and as contracts had said, direct supply hereby grants a licensee a non-exclusive license to use DSSI for one year for X amount of dollars, there would be much less controversy. We wouldn't be here. And that seems to be true according to everything you're saying. If direct supply had chosen a different pricing model, it certainly might have had the benefit of this tax model, tax deduction. But direct supply is in charge of the pricing model that is chosen. It's chosen this alternative one. And this alternative one doesn't seem to me, even by your own concession in this footnote, to fall within the plain language of the statute. Again, my contention is that the structure of the contract, which requires use, in return for being given permission to use the product, in return for being given permission to use DSSI, you have to use it for all of your procurement, and that use generates fees 100% of the time. I think that regardless of what the contract says, and this is the point I was trying to make in my reply brief, that regardless of what the contract says, you still have to do the same analysis under the statute and say, are these fees derived from? Now, maybe it would have been an easier answer, an easier conclusion for you to come to and say, okay, well, yeah, the contract says it, so I agree that these are derived from a license. But I don't think the fact that the contract doesn't say that is necessarily dispositive. You still have to look at the structure of the transaction. But the facts show that the fee is tied to the value of the products, not to accessing the system online. Well, it's tied to the amount of use of the products. Not the amount of use. It's tied to the value purchased from the supplier. Right, which depends on use. The more you use it, the more you buy. No, it depends on what you buy. It depends on the volume of what you buy. You could go on for one minute and charge $100,000, or you could be on for five hours and charge $10. Right, well, no, that's true. It's not, just let me finish, please. It's tied to the value of the product, and that is undisputed. It is undisputed. But, again, you have to use it for all of your purchases. And so you can't just buy one thing with it. You've got to buy everything with it. And it's that requirement that, to my way of thinking, means that the revenue, the gross receipts, are derived from that permission to use. Because in order to get permission to use, you have to agree to use it for everything. And that's what I think derived means. Go ahead. You know, it's just, that does not seem to be what Congress and Treasury were doing. Because under your analysis, basically any online software that we all use would then be available for this tax deduction. And it seems to me they took great care, because we all use online software for different things. And they took great care to separate out online software, the narrow circumstances in which it would be used. I think the problem, what's problematic, is that software is difficult. That because any interaction online is powered by software, right? So you're talking, I think, about any time we use an online service, maybe banking software, that is certainly powered by software. And that is intended to, Congress didn't intend to provide a deduction for that. But there's a fundamental difference with a software product like DSSI. DSSI is sought out by nursing homes for its functionality, for the features that it provides. How is this any different from Amazon? Amazon is sought out because it provides access to a large catalog of goods. But if I understand your argument correctly, Amazon can deduct its entire gross income because all of the gross income is facilitated by the software underlying its website. Does that seem remotely plausible? No, and it's not plausible, and it's not my argument. I'm not saying it is your argument, but it is the logical implication of your argument. I don't think so, and I think not for two reasons. First, there's no requirement to use Amazon exclusively for all of your purchases. I don't see why that is relevant. I think that's what makes... When you do use Amazon, you are using the software underlying its web engine. Every time you use Amazon, you're using that software. And therefore, the logical implication of your argument is that all of its gross revenues is payments for use of its software, even though 98% of its cost is the cost of goods. That looks pretty much inevitable, if we accept your argument. Well, I think there's a distinction between software that is a product, software that one wants to use because of the software, like DSSI, or like Microsoft 365. Microsoft now is available online. You don't actually put it on your network anymore. You log in and you use Microsoft Word. That's a product that is sought out. That's very different than the behind-the-scenes software that powers Amazon. The behind-the-scenes software that powers Amazon is meaningless to the consumer. The consumer doesn't go to Amazon because... The consumer doesn't care about the behind-the-scenes software that powers direct supply. It cares about getting what it wants to order. No, I don't agree with that at all. Consumers don't care about that. No, I believe that direct supply... DSSI is a software product that people seek out, not just to buy, and we know that, Judge. Can you explain to me why Amazon can't make the identical argument that people seek out its website because it's got this great software that facilitates the purchases? No one enters into a contract with Amazon for Amazon to create software to... What people do with Amazon is sign up for Amazon. They're not seeking a particular product, and we know this is a software product because we know that there are competing products that you can download and put onto your network. We know there are at least five of those, and it is a product that companies go and seek out. One seeks out Amazon for what Amazon does for you. They don't seek out the particular software. Mr. White, I agree with you that Microsoft 365 is the better analogy, but it seems to me the issue is how direct supply is making its money off this software, and we were talking earlier with Judge St. Eve about the facts. How do you get around other facts in the record that direct supply's own witnesses testified, for example, that the maintenance fee is for service, it's not for the software, that direct supply does not charge for the software? Again, I think that direct supply, those aren't judicial admissions. He wasn't asked the particular question about does direct supply derive gross receipts from a license or rental. Likewise, under the third-party comparable, I just want to touch on this because I see I'm almost out of time. What I want to touch on is that on the third-party comparable, the argument on access to the software is the same. The requirement to use is what makes the fees payable for access. You don't get access unless you agree to use it for all of your purchases, and those purchases are what generate the fees. On the second component to the third-party comparable, the requirement of substantially identical software, the record was clear. The government didn't dispute that there are five products on the record and that those five products meet the definition of substantially identical under the regs. What they challenged was one declaration from our expert, and that would be an issue that would need remand along with the motion to supplement the record which would need remand on the third-party comparable exception. Thank you, Mr. White. Mr. Dale. May it please the court. My name is Ivan Dale on behalf of the Appellee United States. The conclusion that the fees paid to direct supply are not domestic production gross receipts which would give rise to a deduction under Section 199, that conclusion is demonstrated by the contracts into which direct supply entered, direct supply's testimony from their own officers about what the fees come from, and the implementing regulation, implementing Section 199. So the contracts, I want to make clear, direct supply doesn't just process transactions, and it's not just, the services it provides are not just interactions with software. They provide a part-time implementation and analyst to enable the customer to go live, an assigned integration analyst to monitor and test all data feeds. The nursing homes get access to a wide range of suppliers that have contracted with direct supply to which they may not have otherwise had access. There's an assigned specialist to manage the product catalog and build up the catalog of products which can be purchased. There's in-person training. There's project management. If there's a dispute between nursing homes and their suppliers about a particular transaction, direct supply adjudicates that dispute. There's a maintenance of a database containing order transaction information. That's storage. That's hardware, not software. So, you know, it's not even just a characterization in the contracts, although I would argue that when you're talking about matters of a contract, you're talking about things that direct supply itself has agreed to be bound by, and it's not just a label. Direct supply has agreed that it's, you know, that the fees are specifically in consideration for the provision of many of the services that I just named. And both with providers and suppliers. And as the court noted, you know, direct supply's vice president of sales, Kevin Doherty, was asked directly, and I don't, this is, this is almost exactly parroting the statute. Do you charge providers for using direct supply software? He answered no. Then he was asked, do you charge suppliers for accessing, suppliers for accessing direct supply software? He answered no. Andrew Novotny, direct supply software engineer and team leader, testified specifically, we do not charge providers for the software. Any fee charged nursing homes was, quote, not a license for the software, but a fee to cover our costs for maintaining the system. Mr. White says those are not judicial admissions. How do you respond, if you know what that means? Well, what they are is unrebutted evidence. We didn't, they aren't in a request for admission. But it was, it was in a 30B6 deposition. We asked direct supply to, you know, identify someone that can speak to how these fees are charged. And they produced, you know, these gentlemen. And they testified that, you know, that any fees charged suppliers was, quote, not for the software, but for the transactions. And that's consistent with the contract? And that's absolutely consistent with the language of the contract. I don't think there's anything, at least I didn't see anything in the contract itself that suggests the fees are for licensing or otherwise of the software. Correct. I don't see the word licensing anywhere in the contract. And, well, I do. I actually do see the word licensing in the contract when it refers to the suppliers agree to license, you know, their logo and license their product information. But not in connection with the fees. Right, not software. Right. So clearly direct supply knows how to call something a license. It's words in their contract, but nothing with respect to licensing software. You know, the regulations themselves make clear that this is not a license or other disposition of software. And I think, you know, the prototypical example on the one end of an online access to software is, you know, Microsoft Office 365, the suite of products that you get. And in that case, you pay a subscription fee in exchange for the software. It's, you know, monthly or annual. You do, you know, download something onto your computer. So there's a transfer of software that at least enables you to interact, you know, with Microsoft. There are parts of that suite that are not licensing software. For example, it gives you access to Microsoft OneDrive, which that's storage. That's hardware. And the preamble to the regulations discuss how storage does not meet that threshold. So there are circumstances. In fact, there was another software involved in this case, the TELS software. And the exam team looked at it and decided, yes, this does meet the requirements for the deduction because, again, there was a monthly subscription fee for the building management software. And it was usable as a stand-alone, you know, interaction with the software for its own ends. You know, these direct supplies procurement system requires counterparties. I mean, nothing happens unless there's two parties to the sale. So it's not at all like direct supply. It's not at all like the Microsoft Office suite of products. And it is, as direct supply touts in its own advertisements, it is like an Amazon.com-style virtual marketplace. So in the end of the day, the statute of the record, oh, I was going to mention also the regulations talk about online auction software that is virtually on point to this kind of thing. And there's a transaction fee charged in the online auction software. So, you know, just, and I think your Honor is correct to point out, like if you're interacting with, if you want to buy something on eBay, you have to interact with eBay software. So the fact that, you know, you have to use the software to engage in the transaction really just opens it up to, you know, almost any interaction with e-procurement software that is at least developed in the United States. I mean, I'm sorry, any e-commerce software that is developed in the United States. Thank you. So, direct sales by service is very much like the brokerage service in BATS, the Tenth Circuit case. It's very much like the auction house in example two of the regulation, neither of which gives rise to domestic production gross receipts. And nothing in the evidence compels a different conclusion. Unless the Court has any further questions, I would just ask that the decision of this Court be affirmed as correct. Thank you. Thank you very much. The case is taken under advisement.